IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RICHARD FRASER,

        Plaintiff,                      No. CIV S-08-1935 EFB

      vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.               <u>ORDER</u>

      Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Income Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act ("Act"), respectively. For the reasons discussed below, the court denies plaintiff's motion for summary judgment or remand, and grants the Commissioner's cross-motion for summary judgment.

I. <u>BACKGROUND</u>

      Plaintiff, born August 22, 1971, applied for Disability Income Benefits ("DIB") and Supplemental Security Income ("SSI") on June 21, 2004, due to "Left L3, L2 and L4 transverse process fractures, tibial fracture on left knee, disc bulges between L2, L3 and L4, headaches, resulting from motorcycle accident on 8/14/99." Administrative Record ("AR") 72-74, 565-570, 87. Plaintiff stated that these conditions limit his ability to stand or sit for extended periods of

1

time, severely limit his ability to perform manual labor (e.g., lifting, bending, reaching), and that standing, sitting and manual labor significantly increase his pain and headaches. AR 87. Plaintiff further stated that he stopped working because his "[p]hysician continued to restrict work hours due to pain until it was no longer feasible to work." *Id.*

A hearing was held before administrative law judge ("ALJ") John J. Madden, Jr., on July 9, 2007. Plaintiff, then age 35, testified that he has an AA degree and that his last work attempt was as a self-employed videographer, after receiving training through the California Workers Compensation vocational rehabilitation program. AR 597. He testified that "the doctors thought this was the best idea . . . because I could stand and sit at my computer at home and do the work as I felt, you know, up to it." *Id.* This business did not work out, however, as videotaping weddings caused a lot of back pain, and their editing took far longer than he had anticipated. AR 597-598, 605-606. Plaintiff also compiled some "virtual walkthroughs" for realtors but doesn't plan to do more. AR 615-616.

Before his injuries, plaintiff worked as a bartender and a meat cutter, both requiring heavy lifting and significant standing. AR 599-600, 604-605.

Plaintiff testified that the majority of his pain is "just above my hip shelf." AR 606. He explained, "[i]t feels kind of like somebody's got their fist wrapped around my spine. And then when I do a lot of sitting it radiates out my hip shelfs and than it radiates up my back as well." *Id.* Plaintiff stated that his pain, on medications, averages a 5 or 6 on an ascending scale from 0 to 10. *Id.* However, he experiences side effects from his medications. For example, his pain medication, Norco, makes it hard for plaintiff to concentrate, and makes him nauseated, for which he takes Prevacid. AR 606-607. He also takes a muscle relaxant, which makes him tired, and "migraine pills," most recently Relpax, which "make my head spin, make me feel a little bit goofy." AR 607.

////

////

Plaintiff testified that he is not a surgical candidate. "They have not recommended surgery – at least my primary doctor doesn't feel that it's a really viable option at this time because I broke three of my transverse process. Two of them broke completely off, and the muscles went with that [] and they can't reattach that to my spine [] column. So there's no use . . . because it's just going to cause more scar tissue and probably – possibly even worse condition." AR 607-608. Asked whether his condition had gotten worse since the alleged onset date, plaintiff stated that it had gotten "quite a bit worse," in addition to the flu-like symptoms he experiences most of the time since moving to a new town two years previous. AR 608.

Plaintiff testified that he gets migraines two to three times a week, usually brought on by exertion the day before, like doing "a whole bunch of laundry" or taking a trip. AR 608-09. The migraines last "at least a day" during which plaintiff can't do much more than sit and watch TV. AR 609. Plaintiff also testified that he has a "mild lingering" pain in his left knee that aches when he stands and feels like it's going to explode when he kneels. However, he says the average pain in his knee is a "3 to 4." AR 609.

Plaintiff testified that he can sit 15 to 20 minutes at a time, but then needs to get up and walk around. AR 610. Plaintiff stated that in a full day he could probably sit a total of two hours initially, not counting breaks, but if he had "to do this every day it would be less than an hour probably." AR 611. Plaintiff estimated that he could stand for about 15 to 20 minutes at a time, for a total of less than an hour a day. AR 611. Plaintiff stated that walking was easier, and that he takes his dog for a walk every day for 15-20 minutes, but he "could walk a half an hour a couple of times a day probably." AR 611. Plaintiff testified that he can lift or carry less than five pounds "very infrequently." AR 612.

Plaintiff testified that he takes amitriptyline as a sleep aid, and it helps him get 4 to 6 hours of sleep initially; the remainder of the night he wakes up frequently, every half hour or so, "mostly due to pain in my back." AR 613. He has trouble with his legs falling asleep due to the pressure of lying down. AR 614.

On a typical day, plaintiff stretches, makes and eats breakfast, feeds and walks his dogs, has lunch, takes a walk in the afternoon, makes and eats dinner, and takes the dogs on a walk at night. AR 614. Plaintiff does stretching exercises throughout the day. *Id.* He testified that his only current hobby is photography, because "it's not heavy" and "it's quick." AR 615. He stated that he used to ride his mountain bike, golf, and hunt and fish, but he can't do these anymore. AR 614-15. He stated, "I used to golf, and after talking especially to my chiropractor, he said that's the worst thing you can do, is that motion in your back and especially with any kind of weight." AR 615.

The ALJ issued a decision on December 19, 2007, finding that plaintiff is not disabled.[1] AR 19-34. The ALJ made the following findings:

---

[1] Disability Insurance Benefits ("DIB") are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 *et seq.* Supplemental Security Income ("SSI") is paid to disabled persons with low income. 42 U.S.C. §§ 1382 *et seq.* Under both provisions, disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits. *See* 20 C.F.R. §§ 423(d)(1)(a), 416.920 & 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater,* 81 F.3d 821, 828, n. 5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Bowen*, 482 U.S. at 146, n. 5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. *Id.*

4

1. The claimant met the insured status requirements of the Social Security Act through March 31, 2005.

2. The claimant has not engaged in substantial gainful activity since March 30, 2004, the alleged onset date (20 C.F.R. 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease and degenerative joint disease of the left knee (20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work with additional restrictions as discussed in this decision. [¶] Specifically . . . the claimant's residual functional capacity contains the ability to lift 20 pounds occasionally and 10 pounds frequently, to stand/walk and to sit for 6 hours out of an 8-hour day, and a limitation of pushing and pulling activities to the weight levels just cited. [¶] Additionally . . . the claimant should avoid using his left leg for repeated leg controls. Postural activities, such as climbing, balancing, stooping, kneeling, crouching, and crawling can only be performed occasionally. The claimant also needs to avoid concentrated exposure to extremes of cold, heat, hazardous and dangerous machinery and heights.

6. The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7. The claimant was born on August 22, 1971 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1560(c), 404.1566, 416.960(c), and 416.966).

////

      11.     The claimant has not been under a disability, as defined in the Social Security Act, from March 30, 2004 through the date of this decision (20 C.F.R.  404.1520(g) and 416.920(g)).

On February June 27, 2008, after receiving additional evidence from plaintiff, the Appeals Council denied plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner.  AR 9-12, 13.

## II. ISSUE PRESENTED

Plaintiff's sole contention is that the ALJ improperly rejected, at step four of the sequential analysis, the residual functional capacity assessment of plaintiff's primary treating physician, Dr. Jay Roitman, D.O.

## III. LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied.  *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive.  *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is more than a mere scintilla, but less than a preponderance.  *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).  "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas v. Barnhart*, 278  F.3d 947, 954 (9th Cir. 2002).

## IV. DISCUSSION

Dr. Roitman's residual functional capacity assessment, completed February 1, 2006, opined that plaintiff can work no more than a 6-hour day, consisting of 3 hours of sitting, and 3 hours standing/walking, but "not 3 hours in a row must alternate with each other and walking" [sic].[2] AR 454; *see generally*, AR 452-458. Dr. Roitman explained that plaintiff must get up and move around every 10-15 minutes, and cannot sit again for 10-15 minutes. AR 455. Dr. Roitman further opined that plaintiff can lift and carry no more than 10 pounds on an occasional basis. *Id.*

The ALJ found, in contrast, that plaintiff has the residual functional capacity to perform light work (lift 20 pounds occasionally and 10 pounds frequently, stand/walk and sit up to 6 hours each in an 8-hour day), with the following restrictions: limitation of pushing and pulling to the weights noted; avoid using his left leg for repeated leg controls; only occasional changes in postural activities, such as climbing, balancing, stooping, kneeling, crouching, and crawling; and avoid concentrated exposure to extremes of cold, heat, hazardous and dangerous machinery, and heights. AR 26. Based on this residual functional capacity, the ALJ found that plaintiff is unable to perform his past relevant work but, applying the Medical-Vocational Guidelines ("Grids"), 20 C.F.R., Pt. 404, Subpt. P, App. 2, as a framework, that plaintiff is capable of performing jobs that exist in significant numbers in the national economy. AR 32-33.

Plaintiff asserts that Dr. Roitman is the only treating physician to provide an opinion regarding plaintiff's residual functional capacity, and that the ALJ improperly rejected his opinion based on the rationale that it reflects plaintiff's subjective complaints rather than objective medical findings. Plaintiff argues that "MRI and clinical evidence both support the

---

[2] Dr. Roitman's phrasing is confusing. While both the undersigned and plaintiff's counsel construe Dr. Roitman's notation to indicate that plaintiff can work a total of 6 hours a day, *see* Pl.'s Mem., at 9, the ALJ construed it to mean that each 3-hour period referred to "the same period of time," AR 30. For the reasons that follow, Dr. Roitman's opinion as to this matter is unsupported under either construction.

existence of degenerative conditions which Dr. Roitman found to be consistent with his complaints of pain." Pl.'s Mem., at 12.

The ALJ examined Dr. Roitman's treatment notes and opinions at length, rejecting them for the reasons described in the ALJ's decision.[3]

---

[3] The ALJ recounted and found:

A whole series of statements and letters were issued by Jay Roitman, D.O., concerning his assessment of the claimant's residual functional capacity. He submitted a more restrictive assessment of the claimant's RFC in his letter dated October 2, 2002 (Ex. 14F-41), in which he reported that the claimant's ability to return to his former work in retail was limited by job demands of constant standing and walking, noting that the claimant needed to alternate sitting for up to an hour with standing for a maximum of 1 hour throughout the day.

Dr. Roitman 's one paragraph letter went on the state that the claimant was best suited for "retraining to some type of work from home (i.e. computer), where has control over the number of hours per day worked and how much he sits and stands throughout the day" (Ex. 14F-41). *This statement is given minimal weight as it has no reference to objective medical findings, appearing to be solely based on the claimant's allegations.*

In a more recent one paragraph letter dated June 1, 2005, Dr. Roitman stated that the claimant had only been able to work for approximately 3 to 4 hours each day over the preceding 6 years. This statement went on to note that working this limited scheduled resulted in increased pain, forcing him to decrease his workload to 2 to 3 hours per day (Ex. 14F-11).

However, this "To Whom It May Concern" letter of 6 sentences did not provide any objective medical findings to support the conclusion that the claimant's pain made it difficult for him to maintain gainful employment. *The emphasis is on the claimant's alleged pain, which is not something that can be objectively determined. Thus, Dr. Roitman 's conclusion of an inability to work is based on the claimant's complaints, rather than objective medical findings.*

In completing a lumbar pain questionnaire in February 2006, Dr. Roitman check marked and circled answers that indicated the claimant could sit for 3 hours during an 8-hour day and stand/walk for 3 hours during the same period of time, but that these activities must be alternated (Ex. 14F-5). Additionally, this doctor estimated that the claimant needed to get up and walk around every 10 to 15 minutes. Lifting and carrying were assessed at up to 10 pounds on an occasional basis (Ex. 14F-6).

However, Dr. Roitman also concluded, according to his marks on the form, that the claimant's pain was severe enough to constantly interfere with concentration and attention and that the claimant was incapable of tolerating even low stress at

8

The Commissioner may reject the contradicted opinion of a treating physician only for "specific and legitimate" reasons supported by substantial evidence in the record. *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir.1996). This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states his interpretation of the evidence, and makes a supported finding. *Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir. 1989). While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict by relying on the latter. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir.1995). Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional. *Lester*, 81 F.3d

---

work (Ex. 14F-7). Unscheduled breaks would allegedly be needed every hour, lasting 8 hours before returning to work (Ex.14F-8). [] *Dr. Roitman did not cite any objective medical testing that was performed. This doctor failed to show any objective medical findings for any of the limitations cited in the form.*

A chart note dated December 12, 2005 from Dr. Roitman indicated that the claimant was able to work for less than one hours, especially if he picked up his niece and nephew (Ex. 16F-12). *However, this short statement gave no reason for this limitation.*

A letter dated January 23, 2006 summarized Dr. Roitman's conclusions at that time. Work was limited to working for one hour [per] day; he could occasionally lift and carry 10 pounds; he could not do a full time competitive job that required activity on a sustained basis (Ex. 14F-2). *Yet, the body of this letter appears to be only a recapitulation of the claimant's complaints.*

In completing a form for the State of California Division of Workers' Compensation in March 2007, Dr. Roitman wrote that the claimant was only able to work 2 to 8 hours secondary to pain (Ex. 18F-2), *but this conclusion is unaccompanied by any reasons for these limitations.*

Dr. Roitman's most recent statement is found in a letter date June 11, 2007 (Ex. 19F-1). After declaring that the claimant's condition continued to deteriorate, this doctor went on to state that the claimant had been unable to work for the past 12 months and was unlikely to be well enough to work within the next 12 months (Ex. 19F-1). *Most of the letter, however, only made the case that employment as a videographer was inappropriate for the claimant due to the bending involved in this job.*

AR 30-31 (emphasis added).

9

at 830-31. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. *Id.* at 831. The Commissioner need not give any weight to a conclusory opinion supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir.1999) (rejecting treating physician's conclusory, minimally supported, opinion); *see also Magallanes,* 881 F.2d at 751.

In a thorough and detailed opinion, the ALJ summarized the medical evidence set forth in the administrative transcript, which is more than 600 pages in length. In reaching his conclusions regarding plaintiff's residual functional capacity, the ALJ relied on the formal RFC assessment of State Agency physician Patrick Bianchi, M.D., as approved by Dr. Thornburg, M.D. (the ALJ mistakenly read this as "Thompson"). AR 26, 195-202. The ALJ also relied on the following objective medical findings of examining physicians: (1) the 13-page, May 2004, report of internist Dr. Thomas Leonard, which included a thorough review of all plaintiff's medical records, and concluded that "objectively, his exam is truly unremarkable," AR 389, 28 ("Thomas Leonard, M.D., reported that claimant's examination at that time was within normal limits"); (2) An April 2006 treating note indicating that "the claimant was able to heel and toe walk with his sensory examination near equal in both lower extremities (Ex. 16F-7)," AR 28, citing AR 516;[4] and (3) the June 2007 report of Dr. Charles Bury which provides, as stated by the ALJ:

> [T]he claimant's upper extremities showed 5/5 strength at the shoulders with abduction and adduction; biceps and triceps strength was bilaterally 5/5 and grasp strength was 5/5. His muscle tone was excellent; his deep tendon reflexes were 2+ at the bicep, tricep and wrist, patella and Achilles reflexes. Straight leg raising in a seated position was 90 degrees and 80 degrees in a supine position. Range of motion was minimally restricted in the lumbar spine (Ex. 21F-2).

---

[4] Significantly, though not noted by the ALJ, this appears to be a treatment note of Dr. Roitman. It provides that plaintiff's physical examination, including neurological signs, was within normal limits, although plaintiff's left calf appeared smaller than his right calf, indicating some atrophy. Dr. Roitman's greater concern at the time appeared to be plaintiff's flat affect indicating depression. AR 516.

AR 28.  Dr. Bury further stated that plaintiff "has no apparent restriction in his hips and knees although the right hip is somewhat restricted in lateral adduction."  AR 554.  These reports, in conjunction with the assessments of the State Agency physicians, provide substantial evidence based on objective medical findings for the ALJ's reliance thereon.

Plaintiff argues that the ALJ improperly rejected Dr. Roitman's RFC opinion, as it is in fact supported by objective medical findings and his own clinical findings.  Plaintiff asserts:

> Dr. Roitman's assessments were expressly based on MRI and CT scan evidence of degenerated discs in the lumbar spine (Roitman reports at Tr. 452-53, 451, MRI evidence of degenerative disc disease at L4-5 and later at L1-2 at Tr. 307-08).  He also cited clinical evidence in the form of decreased ranges of cervical motion, lower thoracic spine tenderness, a slight limp, left calf atrophy, trigger points at S1 on the right, and positive straight leg raising bilaterally (Tr. 452-53). Thus, there is most definitely medical evidence to support Dr. Roitman's assessments of the limitations stemming from his back and knee pain. . . . Dr. Roitman's clinical findings of localized tenderness, limping, lower extremity atrophy, trigger points, and positive straight leg raising are clearly sufficient bases on which to find that Mr. Fraser cannot sit or stand/walk for more than three hours each.

Pl.'s Mem., at 11-12.

Plaintiff's argument fails in part because the imaging reports (at least those through 2003) were also available to the other examining and nonexamining physicians and, more significantly, because they are unremarkable:

> **December 1999 MRI Lumbar Spine**: "Old fractures of the L3 and L4 transverse processes; Exam negative for focal disc protrusion-extrusion and spinal stenosis; Bone island within the right sacral site."
>
> **December 1999 MRI Left Knee**: "There is a very small join effusion.  There is no definite evidence for meniscal or ligament tear.  There are transverse metallic screws in the proximal tibia."
>
> **September 2000 MRI Left Knee**: "[N]o evidence of any cruciate tears;" "linear increased signal in the posterior horn of the lateral meniscus," also present in the 1999 MRI, "that may simply represent meniscal attachment fibers," but cannot rule out a tear; and "[s]mall defect in the cortex with some increased signal in the subchondral aspect of the cortex in the lateral tibial plateau."
>
> **October 2000 MRI Lumbar Spine**: "There is minimal dessication of the disc and slight symmetrical posterior annular bulge at L1-2 and L4-5.  No other abnormality identified."

11

**June 2003 MRI Lumbar Spine**: "[N]o evidence for disc protrusion or extrusion within the lumbar spine. . . . no evidence for central or foraminal stenosis . . . minimal disc dessication at L4-5."

**February 2007 MRI Left Knee**: "Mild to moderate degenerative changes/chondromalacia at the patellofemoral joint without full thickness cartilage loss or subchondral bony abnormality; "The Menisci demonstrate no definite tear. Note is made of some magnetic field distortion artifacts involving the anterior horns;" "The tendons and ligaments are intact." "[N]o evidence for joint effusion, Baker's cyst or loose body."

AR 307-311, 548-549. These minimal findings on imaging underscore the heightened probative value of clinical findings. In choosing to discredit the clinical findings of Dr. Roitman, the ALJ properly relied on plaintiff's credibility.

"Residual functional capacity" is an assessment based upon all of the relevant evidence, including the claimant's own description of his limitations, 20 C.F.R. §§ 404.1545(a), 416.945(a), provided such description is credible. "Generally, a claimant's credibility becomes important at the stage where the ALJ is assessing residual functional capacity, because the claimant's subjective statements may tell of greater limitations than can medical evidence alone. Social Security Rule (SSR) 96-7p (1996). For this reason, the ALJ may not reject the claimant's statements regarding [his] limitations merely because they are not supported by objective evidence." *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (citation omitted). "Without affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive." *Morgan v. Apfel*, 169 F. 3d 595, 599 (9th Cir. 1999) (citations omitted). "Credibility determinations are the province of the ALJ." *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995) (citation omitted).

////

////

The ALJ discredited plaintiff's subjective complaints for the following, clearly supported reasons:

> [Plaintiff's] activity level is inconsistent with his allegations of disability. For instance, the claimant requested in April 2004 a second pair of orthotics to wear in hiking boots (Ex. 11F-2). This suggests that the claimant was walking and/or hiking, which can be a rather rigorous physical activity.
>
> The claimant's unrealistic goals have made his pain complaints less convincing. When evaluated by Michael Sommer, M.D., in December 2001, the following comments were made:
>
>> "His wish to be free of pain, while understandable on one hand, is very unrealistic in the real world. The treating medical community for Mr. Fraser needs to help him understand this and focus more on supporting him in spite of pain so that he can rejoin the working community. . . . He also needs to understand that even though he has pain and it feels more intense with activity, that activity is actually good for him and will not intensify his pathology" (Ex. 7F-23).
>
> Furthermore, his medical history has noted an inconsistency between the claimant's complaints and the objective medical findings. Dr. Sommers declared in June 2003 that the claimant always had a disproportion between complaints and findings (Ex. 7F-4). Despite his allegations of worsening pain, the claimant's examination in June 2003 was virtually unchanged from the examination in December 2001. His minimal exercise routine was quite unreasonable for a man of his age and objective findings (Ex. 7F-5).
>
> His pain complaints were exacerbated by activities inconsistent with his physical abilities. In May 2007, Dale Adishian, M.D. noted an improvement of the claimant's knee symptoms [but exacerbation due to bending while working as a videographer].
>
> It should be noted that this comment by his doctor indicates that the claimant is performing more work activity and more physical activity than he admitted at the hearing. The claimant's testimony portrayed him as an individual who essentially does no work and is immobilized. For all of these reasons, the claimant's testimony concerning his subjective complaints and limitations were not convincing.

AR 28-29.

The court finds this explanation for discrediting plaintiff's subjective complaints both clear and convincing, and therefore, for this and the foregoing reasons, that the ALJ set forth specific and legitimate evidence of record for rejecting the residual functional capacity assessment of Dr. Roitman. The appropriateness of the ALJ's analysis is underscored by

13

plaintiff's decision not to challenge the ALJ's findings discrediting plaintiff's subjective complaints.

V. CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment or remand is denied;

2. The Commissioner's cross-motion for summary judgment is granted; and,

3. The Clerk of Court shall enter judgment for the Commissioner.

DATED: September 29, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

14